IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| ANDREA GLOVER, | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. 99-PWG-1688-W |
| TUSCALOOSA CLINIC, P.C., | ) |
| Defendant. | ) |

ENTERED

FEB 15 2002

MEMORANDUM OF OPINION

This matter is before the court for consideration of defendant's motion for summary judgment. This action is before the magistrate judge pursuant to the written consent of the parties to the exercise of jurisdiction by the magistrate judge. 28 U.S.C. § 636(c) and LR 73.2. Andrea Glover, hereinafter referred to as plaintiff, filed this action against defendant Tuscaloosa Clinic, P.C., alleging violations of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.

STANDARD OF REVIEW

Summary judgment is appropriate only if there is no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish a prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been satisfied, however, the non-moving party may not merely rest upon his

pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

The following relevant facts are undisputed or, if disputed, viewed in the light most favorable to plaintiff, the nonmoving party.

HISTORICAL BACKGROUND

Plaintiff is a 54-year-old female. (Glover deposition, p.10). Plaintiff first became employed by defendant, Tuscaloosa Clinic, P.C., in February 1985 in the position of office manager. (Glover deposition, pp.20-21). Tuscaloosa Clinic is a medical clinic consisting of six shareholders: Dr. Thomas McDermott, Dr. Richard Snow, Dr. Pedro Lopez, Dr. Jeanne Lipscomb, Dr. Narayan Krishnamurthy, and Dr. Grier Stewart. (McDermott affidavit, ¶ 3).

2

As office manager, plaintiff was responsible for supervising the Clinic's administrative employees, and making sure the office ran smoothly. (Glover deposition, pp.21, 27). Although plaintiff was never provided with a written job description, her duties included overseeing other employees, billing, completion of financial statements, paying bills, and ordering supplies. (Glover deposition, pp.21-27). Plaintiff also supervised training of newly hired employees by placing them with a seasoned employee who performing that function. (Glover deposition, p.25). Plaintiff testified that the doctors had never asked her to cross-train the office employees, nor offered suggestions on how she should train those employees. (Glover declaration, ¶ 13).

Plaintiff was responsible for doing the initial calculations for bonuses for the doctors. When she arrived at a figure, she would show the figure to the doctors, and an accountant would review the calculations and make a final determination as to what bonuses should be. (Glover deposition, pp.48-50). When plaintiff calculated the bonuses in 1997, the accountant instructed her to subtract $27,000 from the final figure. (Lopez deposition, p.31). When the doctors asked her why she had deducted the figure, plaintiff stated that she had done so upon the instructions from the accountant. (Glover declaration ¶ 24). Although plaintiff did not immediately know the reasoning behind the accountant's instruction, she later learned from the accountant that the deduction was for tax purposes. She relayed the information to the doctors. (Glover declaration, ¶ 24).

On another occasion, Dr. Lopez asked plaintiff to explain a discrepancy between two financial reports with differing totals. (Glover deposition, pp.178-179). Again, plaintiff did not know the specific reason immediately; however, she obtained an explanation within a few days and provided the explanation to the doctors. (Glover declaration, ¶ 5). Later, the clinic's computer consultants reported to the doctors that the discrepancy had been caused by the clinic's computer system. (Lopez deposition, pp.41-42).

Plaintiff, along with the insurance clerk, made efforts to collect outstanding bills by printing reports of outstanding balances over 90 days old, re-filing insurance claims that had not been paid, re-mailing statements to patients that had not yet paid, and calling patients who had not paid. For each patient with an outstanding balance, the insurance clerk would provide a report to the doctor treating the patient, and the doctor would make the final decision regarding whether to write it off or try to collect. (Glover declaration, ¶ 6).

In 1998, plaintiff suggested that Marcie Booth, a receptionist at the clinic, be made the billing clerk, and the doctors approved the suggestion. (Glover deposition, p.158). Plaintiff trained Booth by placing her with the billing clerk. (Glover declaration, ¶ 8). When asked by plaintiff whether Booth was performing her duties correctly, the clerk said that Booth was doing great, and that she had learned the procedures. (Glover declaration, ¶ 8).

Later in 1998, Dr. Lopez said in a meeting that he thought the procedures he had performed had not been billed. (Glover deposition, p.160). In response, plaintiff reconstructed Booth's work for the month of February and determined that there were errors. (Glover deposition, p.160). Plaintiff and the insurance clerk corrected these errors. Plaintiff testified that, until she was terminated, the insurance clerk spent about 10% of her time identifying these errors. (Glover declaration, ¶ 9). Plaintiff further testified that none of the doctors ever told her or indicated that they believed she had not adequately trained Booth or suggested that she train Booth's replacement differently. (Glover declaration, ¶ 9).

On October 13, 1997, the clinic hired Jason Stevens as an assistant office manager. (McDermott deposition, pp.40-41). Plaintiff was told to teach Stevens everything she knew. (Glover deposition, p.92). Plaintiff trained Stevens on payroll, accounts payables, billing, ordering supplies, and her other duties. By the time plaintiff was terminated, Stevens had performed each

4

of these activities at least once without supervision. Plaintiff testified that the doctors never asked her to train him differently. (Glover declaration, ¶ 11).

Plaintiff was responsible for handwriting the minutes of the doctor's meetings and signing the minutes to certify their accuracy. (Glover declaration, ¶ 15). On one occasion, Dr. Lopez asked plaintiff for information that was not reflected in the meeting's agenda. (Glover deposition, p.189). Plaintiff said that she did not know but could find the information. (Glover deposition, p.190). Dr. Lopez noted in the minutes that plaintiff was asked something but did not know the answer. (Glover deposition, p.190). Plaintiff testified that she could not certify the minutes as accurate because she felt that Dr. Lopez was "leaving stuff out." (Glover deposition, p.190). Instead, plaintiff would write her version of what had occurred in the meeting. (Glover declaration, ¶ 15). Plaintiff testified that she never refused to follow an instruction from Dr. Lopez, raised her voice to him, or treated him rudely. (Glover declaration, ¶ 17).

Dr. McDermott testified that in 1997, plaintiff informed Kathy Kirkpatrick, a former employee, that Dr. Lopez had voted against providing certain insurance benefits to the staff during a confidential board meeting. (McDermott affidavit, ¶ 14). Plaintiff testified that she did not tell Kirkpatrick that Dr. Lopez had voted against the benefits, and that it was in fact Dr. McDermott and not Dr. Lopez who voted against the benefits. (Glover declaration, ¶ 18).

Dr. McDermott also testified that the doctors were told by a former employee that plaintiff claimed to have intentionally delayed distributing bonuses after not receiving the raise she expected in 1997. (McDermott affidavit, ¶ 13). Plaintiff denies that there had been a delay. She testified that she could not have delayed the bonuses in light of the "tight schedule" under which she was working to get them done. (Glover deposition, pp.148-150).

5

Plaintiff also served as a consultant for a catering and bridal shop called A Bride To Be for a period of time during 1997-1998. Plaintiff was responsible for maintaining the shop's books, and used a home computer provided by A Bride To Be. (Glover deposition, p.136). Plaintiff used the clinic's copy machine for some A Bride To Be business. Most of the time this activity was limited to after hours. Plaintiff provided her own paper or paid for the clinic's paper she used. (Glover deposition, p.137). Plaintiff testified that she had telephone conversations with Connie Sullivan at A Bride To Be on company time, but they were limited to less than two minutes, and usually involved catering events for the clinic. (Glover deposition, pp.138-139).

Plaintiff testified that she never left work early, other than for business reasons of which the doctors were informed and, further, that she did not take long lunches. (Glover declaration, ¶ 20).

In early 1998, the doctors insisted that plaintiff purchase employment practices liability insurance for the clinic. The insurance covered discrimination of employment if any employee sued the clinic for any reason. (Glover deposition, p.91). Before the policy became effective on April 1, 1998, the doctors repeatedly asked plaintiff whether it was in effect. (Glover deposition, p.90).

On June 26, 1998, plaintiff was terminated. Dr. Snow gave her a release and asked that she sign it. (Glover deposition, p.90). The release provided that plaintiff would make no claims against the clinic, including discrimination claims. (Glover declaration attachment). Plaintiff did not sign the release, which expired on July 17, 1998. (Glover declaration attachment; Glover deposition, p.107). Dr. McDermott testified that he had never before given an employee a release package to sign prior to plaintiff, nor has he asked for a release after plaintiff's termination. (McDermott deposition, p.194).

Jo Smith, a 56 year old female, submitted a resume for the position of office manager to the clinic on July 7, 1998. (Exhibit A). The clinic first attempted to contact Smith on July 22, 1998,

and Smith was hired on September 8, 1998. (McDermott deposition, pp.41-43). Since that time, Smith and Stevens have worked together as co-managers at the clinic.

Dr. McDermott reduced to writing the reasons for plaintiff's termination on three occasions. (Exhibit 18; Exhibit A; Exhibit C) In a personal note to file drafted within 48 hours of plaintiff's termination (Exhibit 18), Dr. McDermott listed several events that led to plaintiff's release:

1. Plaintiff was encouraged to take computer courses to improve necessary skills concerning spread sheet usage. On two occasions, plaintiff took courses scheduled during business hours, depriving the clinic of managerial functions.

2. Plaintiff was spending a great deal of time out of the office pursuing personal business.

3. In the summer of 1997, there was a complete turnover of billing crew. Plaintiff had a meeting scheduled in Pensacola and was unwilling to stay and ensure the office continued to function, causing severe disruption of the office.

4. Even after the doctors increased business meetings to allow frequent communication of needs to plaintiff, there was a "tug of war" type environment with respect to getting details from plaintiff concerning problems in the office.

5. Plaintiff could not explain substantial bonus losses to the doctors, and no efforts were volunteered or made during the following weeks to look into the subject.

6. Plaintiff made no apparent effort to look into and explain how the sleep lab lost money for eighteen months unnoticed, as well as other inconsistencies on the books.

7. Numerous billing errors and inconsistencies were discovered by the doctors as a result of plaintiff's failure to teach and supervise the billing crew.

In an affidavit to the EEOC (Exhibit C), Dr. McDermott stated:

> Ms. Glover was terminated because in the opinion of the doctors who make up the Clinic's Board of Directors, over the last few years she had proven that she could not manage the clinic in a way that was satisfactory to us. At the time she was terminated, she was no longer performing her job adequately. For example, we discovered *serious bookkeeping errors, billing problems, and accounting discrepancies* that had occurred under Ms. Glover's watch, and when we confronted Ms. Glover about the problems, she could not give us a satisfactory explanation. (Emphasis added). In our opinion, bookkeeping and accounting problems are an office manager's responsibility, and if the office manager cannot explain or correct them, then that office manager should be terminated. This is exactly what happened in Ms. Glover's case.

(Emphasis added).

In an affidavit to this court (Exhibit A), Dr. McDermott stated "Ms. Glover was terminated, in general terms, for poor job performance and because we had lost confidence in her ability to manage the office." Dr. McDermott listed specific reasons for plaintiff's termination, including bookkeeping and accounting problems, plaintiff's inability to explain or correct the problems to the doctor's satisfaction, and plaintiff's defensive disposition. Additional reasons for plaintiff's termination were also stated:

1. Jason Stevens was hired in 1997 to be plaintiff's Assistant Manager. Plaintiff appeared resistant to the doctors' suggestion that she train Stevens to perform her administrative duties, and ultimately failed to adequately train Stevens.

2. Plaintiff failed to sufficiently cross-train the office employees.

3. Plaintiff had frequent conflicts with Dr. Lopez and appeared not to respect his authority as one of her bosses and owner of the clinic.

4. The doctors were told by a former employee that plaintiff claimed to have intentionally delayed distributing bonuses after not receiving an expected raise.

5. Following a confidential board meeting, plaintiff told a former employee (Kathy Kirkpatrick) that Dr. Lopez had voted against providing certain insurance benefits to the staff.

6. Plaintiff conducted some of her personal business in the office, occasionally using clinic phones and equipment to perform work for a catering company and a clothing line.

7. Plaintiff frequently left before closing time, and took too many long lunches.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer...to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 4(a)(1) of the Age Discrimination in Employment of 1967 makes it "unlawful for an employer to discharge or otherwise discriminate against any individual...because of such individual's age." 29 U.S.C.A. § 623(a).

There is no direct evidence of sex or age discrimination in this case which implicates the *McDonnell/Burdine* framework analysis. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527 (11th Cir. 1977), *cert denied*, 522 U.S. 1045 (1998). The plaintiff bears the initial burden of proving that sex and/or age was a determining factor in the clinic's decision to terminate her employment by establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the plaintiff meets this burden, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its action. *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Once this burden is met, plaintiff must demonstrate by a preponderance of the evidence that defendant's reason is pretextual. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 257-58 (1981).

9

Prima Facie Case

"An employee establishes a prima facie case of discrimination in termination when the employee shows (1) membership in a protected class, (2) qualification for the position held, (3) termination, (4) and replacement with a person outside the protected class." *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995). It is undisputed that plaintiff is a member of the protected class, and that plaintiff was terminated, leaving only the second and fourth elements in dispute. As discussed below, plaintiff has established a prima facie case.

A.  Qualification for the Position Held

The clinic asserts that plaintiff was no longer qualified to be Office Manager at the time of her dismissal given the numerous problems that had developed concerning her job performance: Bookkeeping and accounting problems, plaintiff's inability to explain or correct the problems to the doctor's satisfaction, failure to adequately train Jason Stevens, failure to cross-train other office employees, conflicts with Dr. Lopez, disclosure of votes from a confidential meeting, intentional delay of the doctor's bonuses, and improperly conducting personal business at the clinic using the clinic's equipment. Plaintiff has presented evidence that she was not at fault for these problems. *(See* Plaintiff's Brief). Plaintiff is not required to disprove performance deficiencies cited by the defendant as the reasons for the termination as part of her prima facie case. "The prima facie burden is not so onerous." See *Davenport v. Riverview Gardens School District*, 30 F.3d 940, 944 (8th Cir. 1994).

Plaintiff must show only that she "possessed the basic skills necessary for the performance of her job." *De la Cruz v. New York Human Resources Administration*, 82 F.3d 16, 20 (2d Cir. 1996). As here, where plaintiff has enjoyed a fourteen year tenure as Office Manager, with no previous negative evaluations, it is a reasonable inference that she is qualified to hold that position.

See *Damon v. Fleming Supermarkets of Florida*, 196 F.3d 1354, 1360 (11th Cir. 1999); *Pace v. Southern Railway System*, 701 F.2d 1383, 1386 (11th Cir. 1983).

B.   Replacement with a Person Outside the Protected Class.

The clinic contends that plaintiff fails to satisfy element four because she was replaced by two Co-Managers, a younger male [Jason Stevens] and an *older female* [Jo Smith]. However, a plaintiff need not demonstrate replacement with an individual outside the protected class to establish the prima facie case. See *Stanfield v. Answering Service, Inc.*, 867 F.2d 1290, 1293-1294 (11th Cir. 1989); *Buckley v. Hospital Corp. of America*, 758 F.2d 1525, 1530 (11th Cir. 1985). If plaintiff demonstrates that she was terminated "under circumstances which give rise to an inference of unlawful discrimination," the prima facie burden is met. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253.

On June 26, 2000, plaintiff was terminated and given a release to sign, which plaintiff refused to sign. (Glover deposition, p.90). An older female [54 years old], Jo Smith, submitted a resume to the clinic on July 7, 1998, but was not contacted by the clinic until five days after the twenty-one-day deadline for plaintiff to sign the release had expired. (Glover declaration attachment; McDermott deposition, pp.41-43). That the clinic hired a female older than plaintiff only after plaintiff had refused to sign a release would permit a reasonable inference that the hiring may have been motivated by the possibility of a lawsuit. The hiring, then, "would scarcely rule out the inference of discrimination." See *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1535 (11th Cir. 1984).

Plaintiff has also offered evidence which establishes a genuine issue of material fact as to whether Stevens, a male, was the sole replacement for plaintiff during the interim between plaintiff's termination on June 26, 1998, and the hiring of Jo Smith on September 8, 1998. The minutes of the

11

doctor's meetings on June 30, 1998 and August 11, 1998 refer to Stevens as "manager". (Lopez deposition, Exhibit 2, 3). When asked about this reference, Dr. Lopez stated:

> Q: No, right here, where it's got Jason Stevens (indicating)?
>
> A: It says "manager."
>
> Q: All right. Is that a lie?
>
> A: At that time, we were looking into getting co-managers.
>
> Q: Alright. But at that time, he was the manager, correct?
>
> A: I would guess.

Additionally, Stevens received a $2000 raise on July 7, 1998, eleven days after plaintiff's termination. (Defendant's Interrogatory Responses, #2).

Viewing the evidence in a light most favorable to plaintiff, the court concludes that plaintiff has established a prima facie case of sex and age discrimination. Defendant's have articulated a nondiscriminatory reason for plaintiff's termination, maintaining that plaintiff was terminated due to numerous job performance problems. *See* Section I.A.

  II. Whether the Nondiscriminatory Reasons Offered
     <u>by the Clinic Are a Pretext for Discrimination</u>

In order to avoid summary judgment, plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that the clinic's proffered nondiscriminatory reasons for plaintiff's termination are pretextual. *Chapman v. Transport*, 229 F.3d 1012, 1025-26 (11th Cir. 2000). Under the *McDonnell Douglas* framework, plaintiff must establish this burden "either directly by persuading the factfinder that a discriminatory reason motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1533 n.7 (11th Cir. 1997).

As discussed below, plaintiff has presented a legally sufficient evidentiary basis from which a reasonable jury could find that the clinic dismissed plaintiff because of her age and/or sex.

The clinic alleges a number of nondiscriminatory reasons for plaintiff's termination, including bookkeeping and accounting problems, plaintiff's inability to explain or correct the problems to the doctor's satisfaction, failure to adequately train Jason Stevens, failure to cross-train other office employees, conflicts with Dr. Lopez, disclosure of votes from a confidential meeting, intentional delay of the doctor's bonuses, and improperly conducting personal business at the clinic using the clinic's equipment. A reasonable juror could infer that the reasons proffered by the clinic were after-the-fact rationalizations and pretextual in part because of Dr. McDermott's inconsistent explanations for the clinic's decision to terminate plaintiff.

In the personal note to file, Dr. McDermott described recent events leading to plaintiff's termination: On two occasions plaintiff took computer courses during business hours, depriving the clinic of managerial function; plaintiff spent a great deal of time absent from the office while pursuing personal business; following a complete turnover of the billing crew in 1997, plaintiff was unwilling to change plans to attend a meeting in Pensacola to stay and manage the office; and the doctor's experienced a "tug of war" type environment with respect to getting details from plaintiff concerning billing and accounting problems and inconsistencies. *(See* Exhibit 18). The personal note does not list several additional reasons cited by Dr. McDermott in an affidavit to this court, including failure to train Jason Stevens, lack of cross-training, insubordination to Dr. Lopez, intentionally delaying bonuses, and revealing doctor's votes on employee issues. (McDermott Affidavit ¶ 10-16).

Dr. McDermott's affidavit in response to plaintiff's filing with the EEOC also neglected to mention these reasons:

> Ms. Glover was terminated because in the opinion of the doctors who make up the Clinic's Board of Directors, over the last few years she had proven that she could not manage the Clinic in a way that was satisfactory to us. At the time she was terminated, she was no longer performing her job adequately. For example, we discovered serious *bookkeeping errors, billing problems, and accounting discrepancies* that had occurred under Ms. Glover's watch, and when we confronted Ms. Glover about the problems, she could not give us a satisfactory explanation. In our opinion, *bookkeeping and accounting problems* are an office manager's responsibility, and if the office manager cannot explain or correct them, then that office manager should be terminated.

Further, Dr. McDermott appears to have modified and/or abandoned a number of the reasons set forth in his personal note. Dr. McDermott's affidavit in this court does not mention the two occasions on which plaintiff took computer courses scheduled during business hours nor plaintiff's alleged refusal to stay and work following the turnover of the billing crew in 1997. (McDermott deposition; Exhibit 18, n.1-3). From such discrepancies a reasonable juror could infer that the reasons proffered by the clinic were pretextual, developed over time to rebut the evidence suggesting discrimination offered by plaintiff. See *Equal Employment Opportunity Commision v. Ethan Allen, Inc.*, 44 F.3d 116, 119-120 (2d Cir. 1994); *Perfetti v. First Nat. Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991).

Further, in early 1998, the doctors specifically directed plaintiff to purchase liability insurance that would cover employment discrimination, and repeatedly asked plaintiff whether it was in effect. (Glover deposition, pp.90-91). Plaintiff was terminated in June of 1998, after the policy became effective in April of 1998, although many of the reasons proffered by the clinic allegedly arose prior to the effective date of policy. The sequence of events could lead a reasonable

jury to infer that the doctors knew that plaintiff's termination would be a discriminatory act covered by the policy.

Plaintiff has either denied the clinic's allegations or offered evidence calling into question each reason offered by the clinic for her termination. *(See* Plaintiff's Brief, p.9-27). Plaintiff has offered sufficient evidence for a jury determination. The clinic may well establish that plaintiff was terminated for reasons not related to age or sex; however, this is a question for the jury.

Based on the foregoing, the defendant's motion for summary judgment is due to be denied. A separate order consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 15th day of February, 2002.

_____
PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE